IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT EASTERN DIVISION
CUYAHOGA COUNTY, OHIO

Dr. John Doe,
14100 Cedar Road
Cleveland, Ohio 44121
      PLAINTIFF,

COMPLAINT
42 U.S.C. SECTION 1983
AND OTHER CIVIL ISSUES

v.

# 1 : 05CV0576

CASE NO:

University Hospitals Health System
11100 Euclid Avenue
Cleveland, Ohio 44106

and

Javier Lopez,MD
Former Director
Department of Surgery
UHHS St. Michaels Hospital

and

UHHS Saint Michael Hospital
Medical Executive Committee
Members
Dr. Frank Karfes, DDS Chairman of Board
P Adamek, M.D.
Javier Lopez, M.D
R. Mehta M.D.
A. Torres M..D.
B. Cutujian M.D.
R. Enrique M.D.
Richard Frenchie, Former President
And Former CEO SMH

JUDGE POLSTER
MAG. JUDGE HEMANN
JUDGE

JURY DEMAND ENDORSED
HEREIN

and

Dr. Kevin D. Cooper,
University Hospitals Health Systems
University Hospitals Dermatology
Associates
11100 Euclid Avenue
Cleveland, Ohio 44106

[UHHS- SAINT MICHAEL HOSPITAL
FORMER MEDICAL EXECUTIVE COMMITTEE
HEARING OFFICER]

DEFENDANTS.


PARTIES

1.    The plaintiff, Dr. John Doe resides in Cleveland, Ohio and is self-employed.   He is a long

time resident of Cleveland, Ohio and is a United States Citizen and who at time relevant

was a duly licensed Medical Doctor and a Board Certified Surgeon.

2.   The Defendants include University Hospital Health System and the former Board of Directors

and Medical Committee of UHHS Saint Michael Hospital which was comprised of the named

staff physicians and DR. Kenneth Cooper, a dermatologist with University Hospital Heath

Systems.

3.    These defendant were at all times relevant, acting under authorization of state laws and /or

under the color of state law for the purposes of 42 U.S.C. Section 1983. The University

Hospital Health Systems are a public entity and their Medical Review Committees, operate in

legal status in and during medical peer reviews under statutes and codes which are created

in accordance with state physician licensing standards and requirements.  Furthermore, this

peer review process is a subordinate agency for physician state licensing board related

action and results in certain clearly defined sanctions which were detrimental to the

various protected federal rights of the plaintiff as alleged herein.

4.    The individual named defendant physicians acted in their official capacities as officers

of a UHHS' peer review and medical executive committees and the medical board.

As such, they are also deemed to be 'state actor's' for the purposes of Section

1983.  These are sued in their individual and official capacities.


## JURISDICTION

5.    This is a cause of action brought under 42 U.S.C. Section 1983 and other relevant

statues and common law remedies which implicates the plaintiff's fundamental rights and

civil rights regarding his due process rights both procedural and substantive.   The plaintiff

enjoys as a physician certain fundamental property interests which are protected by these

Due Process considerations by the Fourteenth Amendment to the U.S. Constitution and

by all relevant and applicable federal and state laws and/or codes pertaining to such

peer review due process considerations.

6.    Jurisdiction is sited according to the Federal Rules of Procedure and 28 U.S.C. 1331, 14334,

et. al and 42 U..S.C, 1983, 1985 and 1988.  Further jurisdiction is proper  pursuant to the civil

RICO remedies at 18 U.S.C. 1964, and the holdings of the U.S. Supreme Court in Tafflin v. Levitt,

493 U.S. 455 (l990).


## VENUE

7.    At all times relevant, the acts and conduct complained of occurred within the political

subdivision of this district and Cuyahoga County, Ohio.   The plaintiff has resided and still

resides within Cuyahoga County, Ohio.  Further, for the purposes of RICO venue is properly

situated in Cuyahoga County, Ohio.

## BACKGROUND

8.  On December 10th, 2002, Dr. Doe, a staff physician and long term surgeon with privileges

at Saint Michael's Hospital, in Cleveland, Ohio was asked to perform a laparoscopic

cholecystectomy on a young female patient who presented with chronic abdominal pain.

The surgery lasted for over an hour and with some complications associated with such

types of surgeries, not uncommon to the same, the patient was kept in hospital care and

specifically later released with having undergone an otherwise successful surgery which resulted

in the removal of the gallbladder and rectify some other medical problems according the surgeon

which were in part caused by comorbidity issues and adhesions in the patients abdomen area.

9.   After the surgery, the patient was given to follow up care at Saint Michael's Hospital

for the next seven days exclusive to the plaintiff.  On December 18th, 2002, the surgical

director of Saint Michaels, Dr. Lopez, called Dr. Doe, and informed him that he was being s

suspended immediately from the staff membership and all patient care due to a complaint from

a fellow doctor who witnessed the surgery which occurred on December 10th, 2002.

10.   Doctor Doe immediately requested verbally a peer review of surgical associates

to review this particular operation and its outcome before the Board and the Hospital

Director made its decision to suspend his privileges at the hospital.

11.   The plaintiff was not given much if any details, about the reasons why he was

being suspended except to say that Dr. Adamek, the anethesiologist had filed a complaint

against him over the surgical procedures Dr, Adamek stated were alleged to be substandard.

12. The hospital made its decision to suspend the plaintiff on December 18, 2002.
The plaintiff referred the patient to University Hospital's main campus on December 19th and
after three weeks there, she was discharged with unremarkable indications, fully recovered.

13. The patient never presented again with any serious related medical conditions pertinent to
this surgery according to all available medical information to date.

14. The Medical Executive Committee however decided to meet and make a further
recommendation as to the immediate suspension of the plaintiff on December 20th, 2002.
This meeting was exactly two days after the plaintiff had been first informed of this
decision to suspend. The peer review scheduled for December 20, 2002 was cancelled without
explanation by UHHS-St. Michael's Hospital one hour prior to the scheduled meeting and
rescheduled for December 30, 2002 at a time when the hospital was well aware Dr. Doe would
be out of the county and unable to participate in his own defense.

15. The plaintiff requested additional time to obtain charting records and the allegations
and to present a defense to the reviewing Board/Committee.

16. The hearing was reset for December 30th, 2002. The doctor was out of the country
on travel during the holidays but nonetheless, the Committee met and entertained a brief
letter from the doctor stating he was out of the country and briefly stating his position
in regards to the surgery.

17. The Committee after about an hour meeting, decided to not only uphold the suspension
but also, file a notice with the National Data Base that the doctor had in fact resigned
while under investigation for his alleged questionable medical procedures employed
during this indicated surgery.

18.   On this committee and as an integral part of this committee was the chief complainant Dr. Adamek, the surgical anesthesiologist and the president of the committee review board.

19.   Thereafter, the doctor wrote to the Hospital's Peer Review Committee indicating that the meeting and the decision to continue the suspension was undertaken without his genuine opportunity for a true review and was, in effect, violative of his due process rights, given the totality of the circumstances.

20.   The plaintiff appealed this decision and after hiring counsel, the University Hospital Health Systems, allowed the plaintiff an appeal according to procedure.  In time, an "independent" hearing officer was proffered by the hospital system, Dr. Kenneth Cooper who was specifically reference as "not being in competition with any doctors on staff at Saint Michaels" and not a member of that staff.

21.   No other information was forwarded to the plaintiff or his counsel about this independent hearing officer's relationship to the hospital system except that he was a noted dermatologist.   The plaintiff nor his counsel objected to this appointment of Dr. Cooper, trusting that this representation was made in good faith.

22.   Thereafter, after several months elapsed and several issues involving discovery were processed between the hospital system and counsel for the plaintiff, a hearing was held in October,2003.   The hearing officer made his final report on December 3, 2003.

23.   The hearing resulted in the hearing officer upholding the original suspension and the recommendation that this suspension being noticed to the National Data Bank..."regarding a resignation pending an investigation...." under the relevant, HCQIA [Federal Law

authorizing such peer reviews] requirements as per the hearing officers findings and order

24.    A subsequent appeal and request for reconsideration resulted in another finding that

the original findings were substantiated and the evidence did not support the plaintiff's

position challenging the original complaint and findings.   The National Data Bank notice

was not rescinded as a result of these various findings and orders.

25.    The plaintiff indicates that he did not submit a re-application for his privileges to be renewed

in the year of 2002 at Saint Michael Hospital.  He did acknowledge receiving several notices

to the effect that he had a limited amount of time to do this.  The plaintiff indicates he

did not submit a new application prior to the surgery of December 10, 2002.

26.    The privileges therefore, were to terminate, due a specific voluntary failure on the part

of Dr. Doe to re apply for his extended privileges in November of 2002.  By express

letter contents sent by the Saint Michael hospital's surgical the privileges of Dr. Doe were

set to expire on December 31, 2002.  He had not reapplied by the time set forth in the

November letter and therefore, as he performed the surgery on December 10th, he knew

his privileges were to end at Saint Michael's by December 31, 2002.

27.    The medical committee nonetheless, took steps to immediately suspend him from patient

care, nonetheless, knowing his privileges were set to terminate by self-default within a matter

of thirteen days from the date of their original decision.

28.    After the surgery and after the plaintiff was allowed to care for the surgical patient for over

seven days in post operative status, the hospital, after it had suspended the doctor's privileges

on a summary basis, nonetheless, writes to the plaintiff on December 24, 2002 and offers him

yet another opportunity to re-apply for his privileges to extend beyond the December 31, 2002

deadline already set in motion by the former default.

29.    The doctor, now under an immediate peer review and a summary suspension by this very

same hospital's executive committee, does not reapply or follow the invitation extended in

this post suspension hospital letter asking him to re-apply rather incongruently for his

suspended privileges to be extended.

30.    The doctor's belief is that his privileges were set to terminate on December 31, 2002

and he was also aware that the hospital was sending a notice of this Committee's decision

and his status to the National Data Bank .

## COUNT ONE

The University Hospital Health Systems
Violated The Plaintiff's Procedural Due Process
Guaranteed under the 14th Amendment In
Summarily Suspended His Privileges and
Sending Notice of the Same to the National Data
Bank

31. The plaintiff re-alleges paragraphs one through thirty, as if fully rewritten and further

states:

32.    The plaintiff herein alleges, that the University Hospital Health Services, acting through its

agents, the Director of Surgery of Saint Michael Hospital at the time, and through its

Medical Executive Committee, in December of 2002, deprived and acted deliberately indifferent

to the plaintiff's constitutional liberty interest found in his staff surgeons privileges at

the Saint Michael Hospital where he had worked as a surgeon for over..... years...

when they summarily suspended his privileges, in a manner which was inconsistent

with the doctor's procedural due process rights on or about December 18th, 2002.

33. The plaintiff specifically was informed , eight days after the surgery, while he was still the primary physician for the surgical patient and treating her in a post operative manner at Saint Michael Hospital and still while on call at the hospital, the week following this surgery, that he was summarily suspended from his privileges on December 18th, 2002.

34. The plaintiff alleges that the hospital never gave him an initial opportunity to be fully heard and/or to review, investigate and/or prepare and present a challenged to this initial summary judgment decision which denied him his fundamental due process rights to be heard and present evidence before his privileges and property rights were so determined in a literal summary fashion, absent any true application of due process standards by the University Hospital Health System and then acting chief surgical supervisor, Defendant Dr. Lopez.

35. This premature and initial decision result in the plaintiff having a report made to the National Data Bank regarding this issue which was never fully vetted and challenged in an appropriate and lawful manner prior to this happening. This reporting specifically and proximately caused the plaintiff substantial harm and itself represents a constitutional deprivation of his fundament due process rights under the 14th Amendment and relevant case law.

36. As a proximate result of this lack and deprivation of the plaintiff's due process and this subsequent reporting of this summary suspension under the circumstances as it arose, the plaintiff suffered serious economic threat of loss and was made to experienced, because of the denial of his due process safeguards, professional detriment. As a proximate cause of the same, the plaintiff also experienced great emotional upset and mental anguish. He was forced to hire counsel and defend his actions and conduct, which took over a year to resolve and in doing so, he incurred other associated harm to his professional reputation, economic losses and other legal detriment.

## COUNT TWO

### THE PLAINTIFF'S DUE PROCESS RIGHTS AND THE DECISION TO SUMMARILY SUSPEND BY THE UHHS SAINT MICHAEL HOSPITAL EXECUTIVE COMMITTEE MEMBERS AND DR. LOPEZ A TRUE DUE PROCESS REPORTING VIOLATION

37.   The plaintiff herein incorporates by reference paragraphs one thru thirty six, as if fully rewritten herein and states further:

38.   The Defendants, individually denied him his due process procedural rights when they made a uniform, independent decision to summarily suspend his medical privileges at the Saint Michael' Hospital, in a unilateral manner, without first afforded him a full and impartial hearing and opportunity to be heard on the issue in a reasonable manner; knowing his medical privileges were set to be terminated by operative default by the end of the same year, as a product of the medical doctor's own non-response to the invitation to re-apply.

39.   This result in a notice report being made to the national data bank that the doctor resigned during a pending investigation into his medical care and treatment of a patient, wherein the plaintiff did not have a true and meaningful and proper opportunity to challenge, review and exercise his due process rights before this report was made to the National data bank. AS such, defendants Lopez, Adameck Torres and others as member of the Committee denied the plaintiff of his fundamental liberty interests in his continued employment and his professional property interests as a physician and medical surgical doctor in the region.

40.    This deprivation proximately caused and led to the plaintiff to experience

serious loss, harm and reputation damage to his professional standing in the medical

community where he worked for over twenty five years.

## COUNT THREE

### THE DUE PROCESS CLAIM AGAINST DR. ADAMEK; AN IN CONCERT VIOLATION WITH UHHS SAINT MICHAEL HOSPITAL EXECUTIVE COMMITTEE MEMBERS: A TAINTED INITIAL COMMITTEE DECISION TO SUMMARY SUSPEND

41.    The plaintiff incorporates by reference paragraphs 1-40 and states further;

42.     Defendant Dr. Adamek, wherein he was the chief complainant against the

plaintiff in December 18t, 2002 decision and thereafter , alleging the plaintiff had operated

in a substandard manner, causing unnecessary risk of harm to a patient, specifically then

took a personal and partial interest in having his own allegations confirmed and upheld

by entering into and allowing himself to help vote or decide to suspend the plaintiff's

privileges by his actions in taking part in this initial Medical Executive Committee's

decision to summarily suspend the plaintiff's privileges, without allowing a meaningful

and well noticed hearing to the plaintiff concerning the same, before taking such action.

43.    This action, set a pattern for the University Hospital Health System in this context and

allowed the Executive Committee to become tainted by way of allowing the chief

complainant, to participate in the Executive Committee's hearing to directly input on the

Executive Committee's decision.

44.    This action and/or allowance was a direct affront again the impartiality and process
which was due the plaintiff, in such summary judgment decisions concerning his medical status
and reputation. It is clear, there were medical records which later revealed the chief
complainant had in fact performed his own questionable procedures relating to this same
surgery and these became known during the appeal of the original decision.

45.    The plaintiff, as a result of this demonstrated partiality and deprivation of is fundamental
due process procedural rights, was denied his constitutional rights which are/were clearly
established in his medical profession status and standing.

46.    AS a direct and proximate result of this deprivation, the plaintiff further suffered
both defammatory actions due to the fact this summary suspension was reported as
noted to the National Date Bank by the Executive Committee and named Defendants.
Again, it is clear, that the plaintiff on or before, December 30th, 2002, was not even
made aware of the specific acts or conduct for which he was supposedly responsible
for in 'placing the patient in serious risk of harm.

47.    Further, as plead elsewhere, this patient experienced complications which are
medically indicated for this type of surgery but the plaintiff quickly and effectively
addressed within the same surgical procedure, in the midst of his alleged accusers.
The patient thereafter, was both allowed to be treated by this plaintiff for over eight
days after surgery and this follow up care resulted in the patient fully recovering and
leaving the UHHS system care without any major problems.

COUNT FOUR

THE UHHS HEARING OFFICER'S VIOLATION OF THE
PLAINTIFF RIGHTS TO 14TH AMENDMENT DUE PROCESS;
THE FAILURE TO DISCLOSE A SERIOUS EXISTING
FINANCIAL INTEREST WITH THE UNIVERSITY HOSPITAL

48.     The plaintiff fully re-alleges paragraphs one through forty seven as if fully rewritten herein

and states further:

49.     The Defendant Kenneth Cooper, acting in his personal and official capacity as an

"independent" hearing officer for the University Health Hospital Systems specifically acted

in concert with the University Health Systems and all other named Executive Committee

members in a manner so as to deprive the plaintiff of his fundamental due process rights .

50.     Defendant Cooper and University Health Systems non-disclosure to the plaintiff

of a mutual interest that the two defendants shared in a significant legal lawsuit

that they were co-plaintiffs within, represented a serious breach of the independence

and effort to 'vet' the impartiality of Cooper's independent status as an impartial

hearing officer with the plaintiff and his counsel.

51     Wherein the Defendant Cooper never disclosed any aspect of his serious economic interest

in the medical and financial business interest of the University Health System Hospital,

indicated by his co-plaintiff status in a prior pending lawsuit with the University Hospital

Systems where the suit specifically sought  to create a serious economic benefit in a

continued medical practice and trust beneficiary interest to both the Hospital and himself

as an officer of the same mutual interest, again the due process and equal rights of the

plaintiff's procedural due process were denied to him in a deliberate and deceptive

manner.

52    The plaintiff states because the Defendant did not disclose this close business dealing

with the main University Hospital System and the overall management of the same, he acted

in concert with the other named Defendants, to deprive the plaintiff of his fundamental

constitutional rights and in particular his right to real, adequate and meaningful procedural

due process guaranteed to the plaintiff under the 14th Amendment and relevant federal codes,

laws and regulations.

53    As a proximate result of the same, the plaintiff was made to suffer loss, harm and business

loss and professional and personal reputation loss and also was made to endure a sham

peer review appellate process, costing him much time, money and effort.  The end result

of which the outcome was both not only unfavorable towards the plaintiff and skewed

in its result but clearly beyond the appearance of propriety, tainted in its process and

final determination due to Defendant Coopers lack of disclosure of his serious and

important factual and interested nexus with the University Hospital's Health System

administration. and executive board members and officers, including those represented

as the former CEO and President of Saint Michael Hospital and Board member,

Richard Frenchie and those associated with him on the material  peer review executive

committee of University Hospitals.

54    This economic interest which went undisclosed was a serious breach of the

fairness and impartiality due the plaintiff under the peer review federally protected

right to the same within the federal law authorizing such peer reviews. [See Health

Care Quality Improvement Act Section 11137 (b)(1)]

55    The manner in which this interest was not disclosed was definitely done in a

concerted and even deceptive manner by the UHHS system and represents a serious

combined effort and effect to seriously deprive the plaintiff of his 14th Amendment

property right in his professional standing and working status.  As a proximate

cause, the plaintiff was made to suffer and experience serious losses, harm and

associated deprivations due to this violation of his due process rights and guarantees.

## COUNT FIVE

### THE PLAINTIFF'S 14TH AMENDMENT PROPERTY INTERESTS: A CONTINUOUS VIOLATION OF HIS DUE PROCESS RIGHTS TO HIS PROPERTY INTEREST

56  The plaintiff re-alleges as if restated herein, paragraphs one through fifty -five and states

further:

57.  The deprivation of the plaintiffs fundamental due process rights continued on an ongoing

basis from the start of the entire summary decision in December18, 2002 , continuing through

to the reporting of this suspension pending investigation to the National Data Bank, on

through the final appellate hearing procedures afforded to the plaintiff and his counsel,

occurring throughout 2003 and beyond.

58.    This serious ongoing continued violation of the plaintiff's due process procedural

rights, represents a deliberate indifference to his well settled rights to be free from such

unwarranted and unlawful deprivation of his constitutional liberty interest in his property

rights as a medical professional in his field.

59    These efforts represent a personalized, wanton and reckless approach to the constitutional

violation which in effect is punitive and rises to a level to become malicious in its scope.

60    The deprivations asserted proximately resulted in a series of professional detriments and

adverse consequences which directly affected the plaintiff's ability to maintain his privileges

at other local medical venues.   As a result, the plaintiff was made to suffer both economic

and serious professional and personal harm and losses, including but not limited to his

professional standing and reputation among his peers and medical community where he

worked for over twenty five years as a well known surgeon in the area, prior to this incident

with its attendant clear civil rights infringement and deprivations .

61    This continuing violation is contained in the fact that the plaintiff's reported summary

suspension to the National Date Bank regarding such issues is on ongoing occurrence

and had demonstrable and real ongoing consequences to the plaintiff's professional

standing and ability to perform his occupation and also to maintain a private practice

in a manner which is economically feasible to do so.   Therefore, he has been made to

suffer both economic and professional losses to his reputation as a doctor and surgeon

and the consequence which are proximately related are both professional and economic,

as well as emotional and are defamatory in nature on an ongoing basis.

62    The plaintiff has suffered consequences which have impacted his medical license and

his ability to maintain a career curve which is delineated by his extensive experience

as a Board Certified Surgeon.

SECOND CAUSE OF ACTION

Complaint for Damages for Deprivation of Rights by Defendants DBA: "University Hospital Health System", as defined by Federal Civil Rights Act (42 USC 1981, et. seq.)and 18 U.S.C. 1341, and 1961(I); Racketeer Influenced and Corrupt Organizations (RICO) Claim for damages and for Declaratory Relief, 18 U.S.C. 1964 (a) and (c); This activity began on or about December 10, 2002 and continued on through April 26, 2004 within Cuyahoga County, Ohio.  Whereby jurisdiction and venue are properly placed in Cuyahoga County while the associated Defendants and enterprise did conduct, participate in, directly or indirectly the affairs of the enterprise through a pattern of corrupt activity which constitutes a violation of Ohio Revised Code 2923 (A)(1), Engaging in a Pattern of Corrupt Activity.

63.     Plaintiff incorporates by reference paragraphs 1-62 of this Complaint.

64.     This is a complex civil action for RICO remedies authorized by the federal statues at 19

U.S.C. 1961 et seq.; for declaratory and injunctive relief, for actual, consequential and exemplary

damages; and for all other relief which this honorable U.S. District Court deems just and proper

under all circumstances which have occasioned this Initial Complaint.  See 18 U.S.C. SS 1964(a)

and (c) ("Civil RICO").

65.     The primary cause of this action is a widespread criminal enterprise engaged in a pattern

of racketeering activity across state lines, and a conspiracy to engage in racketeering activity

involving numerous RICO predicate acts during the past five (5) calendar years.

66.     The predicate acts alleged here cluster around acts of fraud and actually defrauding of

various property rights and conspiracy to obstruct justice and circumvent the due process rights

afforded to individuals who are employees and/or independent contractors operating out of

UHHS individual hospital and clinic facilities.

67.     Other RICO predicate acts, although appearing to be isolated events, were actually part of

an overall conspiracy and pattern of racketeering activity alleged herein, e.g. tampering with

evidence, obstruction of justice, fraud and conspiracy to defraud.

68.     The primary objective of the racketeering enterprise has been to inflict severe and

economic hardship upon Plaintiff, with the intent of impairing, obstructing, preventing and

discouraging Plaintiff from seeking judicial activism and/or pursuing recourse in the Court.

## PROCEDURAL HISTORY

69.         In response to this increase in litigation, the Health Care Quality Improvement Act

(HCQIA) of l986 was passed by Congress with the expectation that it would help protect

hospitals and individuals participating on medical peer review committees from potential liability

in the form of money damages after revocation of a physician's hospital privileges. The Act has

established standards for the hospital peer review committees, provides immunity for those

involved in peer review, and has created the National Practitioner Data Bank, a system for

reporting physicians whose competency has been questioned or when the physician has been

sanctioned.

70.    The effect of HCQIA on many of those that have been on the receiving end of a bad

faith peer review committee has been unjust and unfair.  HCQIA helps foster an environment in

the medical community that, instead of promoting the goal of quality health care in America,

allows the peer review process to be perverted for political and economic motives.

71.    Due to state law and the passage of the Health Care Quality Improvement Act of

l986, medical peer review committees have become prone to misuse by those with a vendetta

or dislike for the reviewed physician, and thus the primary purpose of the Act-to attempt

to guarantee the best quality health system possible-has become tainted and perverted.

72.    In a private world, "Sticks and stones may break your bones, but words will never hurt

you," is little more than a cliche.  In the professional world of a physician, this sentiment is untrue,

where negative words, justified or not, that are reflected in a medical peer review can potentially

have horrible effects on a physician's reputation and adversely affect his or her professional and economic opportunities.

73.     While the passage of the Health Care Quality Improvement Act of 1986 was passed with the intention of promoting the best quality health care system, it has subsequently had some unintended negative affects.  Specifically, the peer review immunity and the limits on discoverability provided by the Act contribute to allowing peer review members to engage in arbitrary, bad faith, or malicious peer review hearings without fear of successful reprisal by the unjustly disciplined physician. In addition, the Act's implementation of the National Practitioner Data Base has created the opportunity for unjust negative publicity and damage to the reputation of a physician that is on the wrong end of a bad faith or malicious peer review.

74.     In the 1980's, the health care profession increased its efforts to limit the practices of incompetent physicians through the promotion of credentialing and professional peer review.  To sustain the honor of a physician's practice, an intricate system of peer review evaluation has evolved, and this system provides for the review and critique of physicians who may be perceived as damaging to the profession of physicians.  Generally, state licensure and accreditation standards require hospitals, as well as a few other health care entities, to examine and evaluate the competency and quality of care provided by physicians who have, or are requesting hospital privileges.  The Joint Commission on Accreditation of Health Care Organizations (JCAHO) has defined hospital privileges as "the permission to provide medical and other patient care services in the granting institution, within well-defined limits, based on the individual's professional license and his experience, competence, ability, and judgment."

75.     There are essentially two situations in which hospitals have determined the clinical competency of physicians, either when a physician first applies for medical staff membership and

privileges, or when each physician who is already a member of a medical staff is required to periodically apply for reappointment for membership and privileges. The established procedures for conducting a peer review is generally found in the hospital's bylaws, and provides that the hospital is required to engage in continuous clinical evaluation and monitoring of its physicians, as well as those applying for privileges. A review will primarily consist of a thorough assessment of the physicians' records of surgeries and other performed procedures, in order to search for erroneous diagnoses, unnecessary procedures, and other errors. Once the review is completed, the members of the staff review committee will forward their recommendations to the hospital's governing board to either grant, reinstate, or deny hospital staff privileges, or to make recommendations on any appropriate disciplinary measures if the physician's clinical performance was substandard or dangerous to patients.

76.     Independently completed, the medical peer review process is highly beneficial to the hospital, physicians, and community as well as it enables hospitals to hire and retain only competent physicians. Physicians benefit by obtaining medical and education review of their work, and upon review of their work, they are given access to operating facilities, medical equipment, and support staff. The community benefits by having access to the highest quality of physicians and medical services. A physician's right to access a hospital once the physician has been granted privileges to admit patients and to use the hospital's resources is essential for the success of the physician's practice.

77.     In today's technical and complex world, it is very rare and almost impossible for a physician to have a financially successful practice without hospital privileges. Indeed, with the increasing technology and support services that only hospitals can usually afford, such as patient wards, staffed operating rooms, and medical equipment, it is imperative that physicians

obtain hospital privileges, consequently, any denial or restriction of a physician's hospital privileges will have a destructive financial effect on that physician's private practice.

78.     To maintain privileges, physicians are mandated to allow themselves to be reviewed by the hospital's peer review committees, although the peer review process is terribly flawed in its conduct and treatment of the reviewed physician. The peer review process is essentially a weapon of mass destruction which when effectively utilized by a hospital or a single physician within the hospital is capable of annihilating the professional practice and career of a competing physician for political, economic or retaliatory motivations....that is, it is capable of being a review performed in bad faith, or with malice.

79.     In the 1980's, the efficiency and success of the peer review process became mired down as a result of an increase in litigation initiated by the disciplined physician, in many cases alleging antitrust violations by the reviewing hospital. Physicians denied privileges would likely argue that the denial of privileges violated Sections one and two of the Sherman Antitrust Act which proclaims illegal "every contract combination in the form of trust or otherwise, or conspiracy, in the restraint of trade." The formation of a monopoly or attempt to form a monopoly is also a violation. The excluded physician will argue that the subsequent restriction on their practice was the "result of the anti-competitive motives of peer reviewers who perform the same services at the hospital or health care entity. The physician denied hospital privileges and claiming violation of Section 1 of the Sherman Act must prove: an effect on interstate commerce, a conspiracy or combination, and restraint of trade; and if the argument is successful, and it is proven that there was a violation of antitrust law, the individual physicians participating on the peer review committee can be subjected to treble damages.

80.     Thus, on November 14, 1986, Congress enacted the Health Care Quality Improvement

Act of 1986, in order to, among another things, protect those individuals engaged in

professional review.  Section 11101 of the Act, titled "Findings," established the main

reasons for the Act's passage:

(1) The increasing occurrence of medical malpractice and the need to improve the quality of
medical care have become nationwide problems that warrant greater efforts than those that can be
undertaken by any individual state.

(2) There is a national need to restrict the ability of incompetent physicians to move from state to
state without disclosure or discovery of the physician''s previous damaging or incompetent
performance.

(3) This nationwide problem can be remedied through effective professional peer review.

(4) The threat of private money damage liability under federal laws, including treble damage
liability under federal antitrust law, unreasonably discourages physicians from participating in
effective professional review.

(5) There is an overriding need to provide incentive and protection for physicians engaging in
effective professional peer review.

It was the jury verdict of $2.2 million in damages to the reviewed physician in *Patrick v. Burget*

that provided the main impetus for the passage of the Health Care Quality Improvement Act.

Briefly, in 1972, Dr. Timothy Patrick was a vascular surgeon practicing in the small Oregon

community of Astoria, and became a member of the medical staff of the town''s only hospital,

Columbia Memorial (CMH), and an employee of the Astoria Clinic. In 1973, the partners of the

clinic invited Dr. Patrick to become a partner in the clinic; the offer was declined and Dr. Patrick

instead started his own competing clinic. In retaliation, the physicians at the Astoria Clinic

consistently refused to have professional relations with Dr. Patrick, and as a result Dr. Patrick''s

clinic was referred virtually no patients, even though the Astoria Clinic at times did not have a

general surgeon on staff Over the following years, the relationship between the Astoria Clinic

physicians and Dr. Patrick continued to deteriorate, finally culminating in complete collapse when

a partner of the Astoria Clinic initiated peer review of Dr. Patrick in order to terminate his privileges at CMH. The review hearing was held, with the case against Dr. Patrick focusing on only nine out of the 2,000 to 2,500 surgeries that the he had performed while working in Astoria.

81.     Dr. Patrick did not await the conclusion of the hearing and, after claiming that result of the hearing was preordained, and that the executive committee members were not paying attention, he resigned his privileges at the hospital. Dr. Patrick then filed a lawsuit against CMH and the individual physicians, alleging violations of Sections 1 and 2 of the Sherman Act. Upon the completion of litigation, the jury found that Dr. Patrick was the victim of a malicious peer review and that there was an antitrust violation, and thus awarded Dr. Patrick $650,000, which was then trebled by the court. It was in response to this decision, that Congress addressed the issue of encouraging peer review through statutory protections by the enactment of the Health Care Quality Improvement Act of 1986. In fact, Representative Ron Wyden remarked during the introduction of the Act that the jury award in *Burget* was a precise example of the need for legal protection of those physicians who participate in a peer review process. It should also be recognized the in addition to the HCQIA, each state and the District of Columbia has also passed its own peer review statutes that encourage the quality control of physicians practicing in the state.

82.     In essence, HCQIA was passed to address Congress''s concern that, without legal protection, physicians would be hesitant to participate on peer review committees as a result of retaliatory antitrust lawsuits initiated by the reviewed physician. The Health Care Quality Improvement Act is comprised of three basic elements: first, it provides immunity from liability any peer review activity that has met due process standards; second, HCQIA mandates that hospitals and  insurance carriers report to a national data bank information that relates to the

professional competence of physicians, and thirdly, it requires hospitals to request information from the data bank for all physicians who apply for or have privileges at their institutions.

83.    The Act is considered to be more than an antitrust or peer review exemption; its advocates contend that the primary purpose of the Act was ""*not* just to *protect* the peer review process, but rather to encourage *more aggressive* peer review to eliminate incompetent medical practice." In fact, it was foreseen by those implementing the Act that the national data bank reporting system would actually increase litigation, thus it was imperative that peer review committees be granted immunity to ensure the vital and honest participation of physicians on those peer review committees. It is important to note that HCQIA does not provide the hospital or physicians with immunity from suit or from civil rights actions, but instead limits their immunity to protection from money damages. Additionally, the Act does not create a cause of action for those physicians who argue that a hospital has violated the Act, and the penalty of a hospital's failure to satisfy the peer review standards set forth in Act is that the peer reviewers lose the immunity from money damages.

84.    Under Section 11111(a)(1) of the Act, the scope of the immunity that the Act provides extends to those individuals participating in the peer review, including the hospital, its governing body, the committee conducting the review, any staff member to the review body, and any person under contract or agreement with the review body, as well as anyone who assists or participates in the action.

85.    In addition, any witnesses or others, providing information to the review body are also protected, unless the information that was provided is false and individual providing the information knew it was false. Furthermore, there are certain "reasonableness" standards the must

be met for HCQIA immunity to apply. In order to qualify for immunity from damages, Section

11112(a) provides that the peer review action must have been taken (1) in the reasonable belief

that the action was in furtherance of quality of care; (2) after a reasonable effort to obtain the

facts of the matter; (3) after adequate notice and hearing procedures are afforded to the physician

involved or after such other procedures as are fair to the physician under the circumstances; and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable

effort to obtain the facts and after fair procedures were afforded to the physician.

86.    HCQIA also establishes a presumption that the peer review action meets the above

criteria,"unless the presumption is rebutted by a preponderance of the evidence." Critics of

87.    HCQIA contend that since the peer review committee only has to demonstrate the

subjective requirement that a "reasonable belief that the action was warranted," the accused

physician has a large hurdle to jump.

88.    In addition to providing immunity from damages for hospital members in the peer review
process, HCQIA was also enacted to prevent the ability of incompetent physicians from moving
from state to state without revelation or discovery of the physician''s prior incompetent or
damaging actions.  Accordingly, the National Practitioner Data Bank (NPDB) was created, and
under HCQIA, hospitals and other health care entities that take professional review action against
a physician are mandated to report their actions to the state board of medical examiners, and are
subject to sanctions if they fail to do so.

89.    The various types of information that is required to be reported to the state board of

medical examiners, who subsequently report to the NPDB, include: (1) any professional review that adversely affects the clinical privileges of the physician for longer than thirty days; (2) the surrender of clinical privileges by a physician while an investigation related to possible incompetence or improper professional conduct is underway; (3) the surrender of clinical privileges by a physician in return for the entity''s not conducting an investigation; or (4) in the case of a professional society, a professional review action that adversely affects the membership of a physician in the society.

90.     While a physician does have the ability to request from the NPDB the reported information concerning his or her conduct, and may also dispute the information reported by informing the Secretary of Health and Human Services and the reporting hospital, and the physician must also state the reasons for the dispute. If the reporting hospital declines to revise the challenged information, then the Secretary is tasked with the responsibility of either noting the data as "disputed" and offer a statement as to the nature of the dispute, or in the alternative, correct the information and forward the new report to those entities that have previously made inquiries concerning the disciplined physician.

91.     This method of challenging a peer review provides little in the way of correcting the harm done to a physician''s reputation in the community. It should also be noted that there are a variety

of court cases that extend HCQIA immunity to the actions of a health care entity that complies

with the reporting requirements of the Act. For example, in *Bearden v. Humana Health Plans*,

where a physician was terminated for not meeting the employer''s standard of care, sued for

damage to his reputation following the employer's reporting of the incident as required by

HCQIA, the court observed that the immunity provisions of the Act extended to the reporting of

such conduct. The need for an effective physician peer review and a data bank of incompetent

physicians is not disputed. There are too many cases of incompetent and disruptive physicians in

the medical community to eliminate either the database or the medical peer review system.

92.     Undeniably, it is disturbing to note that even if a physician was able to show that the peer

review reached an incorrect conclusion, that error does not itself meet the burden of contradicting

the existence of the reasonable belief that the committee was furthering the quality of health care,

which is would be required to defeat the qualified immunity under HCQIA. Therefore, despite the

best intentions of the Health Care Quality Improvement Act, there are a number of critical flaws

in the system that foster an environment of bad faith peer review, which ultimately could harm the

reputation of competent physicians.

93.     It is reasonably safe to assume that the majority of peer review committees are honest

evaluations of a physician's performance and are not predisposed to the negative targeting and

disciplining of a certain type of physician. Many critics contend that due to state immunity laws

and federal law, it is accurate to suggest that the current peer review process allows peer review

members the ability to practice arbitrary peer review with little fear of repercussion.

As noted earlier, the consequences of a bad faith peer review can be very harsh for the accused

physician. Therefore, it is essential to ensure that peer reviews are fair and impartial. Some of the

potential consequences include the loss of hospital privileges, which has already been mentioned

as very likely to be disastrous to the success of the physician's practice; the reporting of the

physician's name and infraction to the National Practitioners Data Base; the notification to

insurance/HMO/Medicare entities; and perhaps most destructive of all, the harm to the

physician''s reputation in the community.

94.     It can be argued that whether or not the disciplinary action of the peer review is

overturned, it is wholly foreseeable that the damage to a physician's reputation will have a

longstanding effect on the physician's marketability. Fellow physicians in the community may

hesitate to refer patients to the falsely accused physician, and patients themselves may not feel

comfortable with a physician who has an unjustly tarnished or questionable record.

Interestingly, it appears that many of the sufferers of bad faith peer reviews share many of the

same qualities that can make them an easy target for those seeking to unjustly or maliciously

disqualify them. For instance, solo practitioners, typically not having much political support, are

frequently the victims of bad faith peer reviews, as are physicians who are new to a staff and have

not yet made the necessary political contacts needed for protection from bad faith peer reviews;

and also included in the vulnerable group are physicians who practice procedures that are new or

out of the mainstream.

95.    While it is arguable that the peer review process can be efficient and effective only if the

individuals involved can participate in an open and honest discussion without fear of retaliatory

lawsuits, critics maintain that the current peer review process is highly political and can be easily

manipulated to achieve economic or power-driven gains by those on the peer review committees,

or by physicians with a personal or professional vendetta against a colleague. There are few

options that an accused physician has regarding a peer review. The Health Care Quality

Improvement Act, as well as some state statutes, establishes the procedures that a peer review

must follow, and these procedures are incorporated into a hospital's bylaws. Adding to the

distortion of the peer review process is the tendency of some hospitals to draft the bylaws for

their benefit and protection; including the drafting of provisions that limit a physician's ability to

have an attorney at the proceeding.  This type of provision, and others, make it extremely difficult

for the disciplined physician to prevail in challenging a peer review decision. In addition, HCQIA

itself tends to make it difficult for a disciplined physician to prevail, especially due to its broad

"reasonableness" requirements. For example, Section 11112(a)(1) of the Act merely requires that

the peer review be taken ""in reasonable belief that the action was in furtherance of quality health

care." This broad standard enables hospitals to create options to protect themselves from an

antitrust lawsuit, including the drafting of a provision in the hospital's bylaws stating that "the

committee's recommendation's to the Hospital Board in no way precludes the Board from

exercising its own judgment; or a hospital could rely on pro-competitive justifications." (This

type of language was absent in the UHHS-St. Michael's Hospital bylaws.)  As a result, such

drafting permits a hospital to avoid litigation by "claiming they are doing everything they can to

remain objective." Primarily, there are at least two areas that concern critics of the current peer

review process: the barrier to the discovery of the deliberations of the peer review committee for

use in a civil trial, and the perceived lack of due process available to the reviewed physician.

96.     While a "bad faith" peer review is not protected by HCQIA, in many cases, overcoming

the large burden of proving a malicious or bad faith peer review depends upon the physician's

ability to obtain the information that was disclosed in the peer review hearing.   This issue of the

discoverability of peer review hearing documents is one of the primary problems of the HCQIA.

97.     There is a split of authority regarding whether Section 11137(b)(1) of the Health Care

Quality Improvement Act specifically, or if the Act generally, "creates a federal peer review

privilege that will protect documents, statements, or information used in physician peer review

from discovery in a civil action."

98.     Furthermore, while this report is focused on the discovery limits of HCQIA, it is important

to note that a majority of the states have statutes that prevent discovery of peer review

proceedings. In a case where the peer review privilege was not found, the court in *LeMasters v.*

*Christ Hospital* rejected the defendant hospital's claim that the peer review information desired by

the plaintiff physician was protected by a peer review privilege under HCQIA. The court's

decision In *LeMasters* was based on state law, which states that the information was discoverable

under its laws, and thus, pursuant to Section 11137(b)(1) that the information from the peer

review hearing is to remain confidential unless its disclosure is allowed under state law. Therefore,

the court held that since the information was discoverable under state law, then HCQIA did not

apply and thus the hospital's argument of a federal peer review privilege had failed.

99.     There exists other cases that also hold that HCQIA does not provide a federal discovery

privilege that protects peer review information from discovery in a civil lawsuit. There are also a

variety of cases that do support the existence of a federal statutory privilege under HCQIA.  In

*Cohn v. Wilkes General Hospital*, a chiropractor brought a federal antitrust claim against the

hospital as a result of the denial of hospital privileges. Here, the court held that the plaintiff could

not receive the requested information from the defendant hospital''s peer review process due to

the immunity provisions of HCQIA. Also, in *Wei v. Bonner*, the court there held that the

principles behind HCQIA, referring specifically to the Congressional Findings in the Act, as well

as the public policy behind the protection of the peer review process as privileged, supported the

conclusion that the protection, the court said "in addition to state privilege, there is a federal

statutory peer review privilege. 42 U.S.C. §§ 11137(b)(1). The Act provides that, with some

exceptions, information reported under......the Health Care Quality Improvement Act of 1986 is

confidential and cannot be disclosed."   However, it is important to note that the court went on to

state that while it did find a federal privilege, it would not be applicable in a federal antitrust suit;

the court stated that "the legislative history of the statute makes it clear that the statute does not

cover a federal antitrust suit. The legislative history indicates that the privilege is qualified rather

than absolute."

100.        As mentioned previously, in addition to the federal privilege from discovery of peer

review information, there also exists the barriers of state law that the reviewed physician must

overcome in order to obtain the information used in the physician''s peer review hearing. While

some states have made exceptions to the discoverability of peer review information, not all states have done so. In fact, in *Grande v. Lahey Clinic*, the Appeals Court of Massachusetts considered whether the reviewed physician could depose an expert used in a peer review action in a defamation suit. The plaintiff in the case, Dr. Grande, was cleared in the peer review action and subsequently sought to depose the expert who testified at the peer review action to determine if she was aware of any bad faith activity at the hearing.

101.    The court held that the state''s non-discoverable peer review protection applied to the expert's testimony, and therefore, Dr. Grande was denied the discovery of any potentially damaging testimony that would have supported his defamation suit. Thus, regardless of whether it is federal law or state law that limits discovery, the result is that the reviewed physician has a large hurdle to jump in proving to a court that there was a malicious or bad faith peer review. It is maintained by some that due to the discovery privileges, an accusatory physician involved in the peer review process is able to manipulate the process to achieve ulterior motives, for example by eliminating the economic competition in a particular practice field.

102.    Following the United States Supreme Court''s ruling in *Patrick v. Burget*, and the enactment of the Health Care Quality Improvement Act of 1986, there have been very few courts that have permitted a physician to overcome the immunity and confidentiality protections afforded

peer review hearings Nevertheless, there are a few cases where the court has upheld a verdict

where proof of deliberate and extreme bad faith was present. For example, in *Brown v.*

*Presbyterian Health Care Services*, in which a jury determined there had been an element of bad

faith involved in the peer review of the disciplined physician, the court of appeals affirmed the

jury's decision, and held that the hospital was not entitled to the immunity provisions under

HCQIA. However, this was a case where there was an obvious element of bad faith involved in

the peer review process, since, as the court found, there was a direct link between the accusing

physician who initiated the peer review action and the ultimate influence on the peer review

committee and governing board — especially since the accusing physician was on the same

governing board which made the decision to terminate the accused physician's privileges.

103.     In the case of *Zamanian v. Christian Health Ministry*, the evidence of a direct link

between malice and the peer review action was not as obvious, yet the accused physician was able

to overcome the defendant's claims of immunity. In that case, the court of appeals reversed the

district court's summary judgment after ruling found that there existed evidence that the hospital

had financial and economic reasons to discipline Dr. Zamanian, primarily because he allowed

patients to remain in the hospital for a longer period of time than Medicare authorized, which

resulted in a financial loss for the hospital. After the jury found that a bad faith peer review was

conducted by the defendant hospital and awarded Dr. Zamanian $6 million in damages,

emphasizing how great the barriers are for an accused physician to prevail in a bad faith peer

review case, a civil district judge reversed the jury decision and set aside the award, finding that

the peer review process was indeed entitled to immunity under state and federal laws.

While the Act does require that the peer review hearing be held before a mutually acceptable

arbitrator, the hospital is not required to provide appellate review of the decision following every

hearing. Section 11112(b) of HCQIA provides a "safe harbor" to those health care entities that

correctly adhere to the statutory notice and hearing provisions of the Act. That section provides

that a "health care entity must give the physician involved notice of any adverse professional

review action proposed to be taken, a statement for the reasons of the proposed action, and the

time within which the physician or dentist may request a hearing (which may not be less than

thirty days)."

104.    In addition, the notice is required to provide a summary of the rights involved in the

hearing,  including the right to legal representation; the right to cross-examine witnesses; the right

to present relevant evidence; to submit a written statement at the conclusion of the hearing; the

right to have a record of the hearing; and to receive a written recommendation and the decision,

and the reasons for each. Critics argue however, that once the governing board makes its final

determination, the accused physician is left with virtually no option to appeal the decision of the

board, except perhaps attempting to take the hospital, and the accusing physicians, through an

expensive and time-consuming costly trial.

105.     Hospital privileges have been interpreted as establishing that the practitioner has a

property right. This property right cannot be taken away without "due process." Due process

includes the right to a hearing, the right to present evidence and the right to have the decision

made fairly and without prejudice.

106.     The HCQIA recommends that the physician should get notice of the allegations, time to

prepare for a hearing, a list of witnesses, the right to legal counsel, and an impartial fact finder.

However, the act concludes "A professional review body's failure to meet the conditions described

in this subsection shall not, in itself, constitute failure to meet the standards of this act)." This

failure of the HCQIA to require due process calls into question the fundamental fairness of the

medical peer review system.

107.     The reason that due process should be a part of any fact-finding endeavor was stated by

Justice Goldberg in SILVER v NEW YORK STOCK EXCHANGE, 373 US 341(1963):

> 'Experience teaches...that the affording of procedural safeguards, which by their nature
> serve to illuminate the underlying facts, in itself often operates to prevent erroneous
> decisions on the merits from occurring .'

The purpose of requiring due process is to ensure that the actions taken are not arbitrary,

capricious, or unreasonable. Where there is no due process, the system invites abuse.

Peer review in its current form fails to protect an investigated physician from committee members having an economic or personal bias. Economic bias occurs when a committee member has a financial interest in the outcome. If the challenged physician is a partner or associate, any error that he may have made is likely to be considered to have been unavoidable. On the other hand, peer review has already been used to force a competing physician out of practice, (See, Green R: J Med Assoc Ga 1987; 76:138-140)  Hospital peer review in a hostile environment.

Such economic bias denies due process (See, TUMEY v OHIO, 273 US510 (1927)

The United States Supreme Court struck down a decision from Ohio's municipal court system in which the judge was partly paid from the fines he assessed. The Court found that the system gave an incentive to rule one way rather than the other.  Personal bias is inevitable when coworkers judge each other. Some people are very likable, and others illuminate the room by their absence.

108.    Federal law prohibits a federal judge from hearing cases in which his impartiality might reasonably be questioned or in which he has a financial interest (11). The same standards should apply to member of a peer review committee. The potential for abuse when these suggested procedures are not followed would indicate the need for mandatory due process.

109.    Due process, which is designed to limit these abuses, is not required by the Constitution of the United States unless there is government action that affects a liberty or property right.

110.    The right to practice medicine without a governmental agency erroneously reporting that a physician has been deficient in his actions is a constitutional property right. Rights, even constitutional rights, can be waived by express agreement, or by the failure to assert those rights. State institutions, however, may not make waiver of a constitutional right a condition for

employment.

## HISTORY OF PROCEDURE IN THIS CASE

111.   Plaintiff incorporates by reference paragraphs one through 110, of this complaint.

112.   In 1988, Plaintiff first sought and received staff privileges for the medical staff-general

surgery at UHHS-St. Michael's Hospital.  St. Michael's Hospital was an inner city hospital

which grew to service predominately low income residents in the Slavic Village/Broadway area

of Cleveland, Ohio.  This hospital received federal funding to supplement the cost of treating

indigent patients without any type of medical insurance coverage or the ability to pay for medical

treatment.

113.  The University Hospital Health System's tertiary medical center, University Hospitals of

Cleveland, is the primary affiliate of Case Western Reserve University. University Hospitals Health

System boasts that it is the largest provider of indigent care among private hospitals in the area

indicating that uncompensated care has increased 40% in the last two years to over $50 million in

2001. In addition to the tertiary medical center, Defendant University Hospital Health System

also operates UHHS Bedford Medical Center, UHHS Brown Memorial Hospital, UHHS Geauga

Regional Hospital, UHHS Memorial Hospital of Geneva, UHHS Richmond Heights Hospital,

UHHS Heather Hill,  and has a partnership interest in Southwest General Health Center, Mercy

Medical Center, St. John WestShore Hospital and St. Vincent Charity Hospital in the Greater

Cleveland area and surrounding northeast and northwest communities.  In 1998, St. Michael

Hospital now UHHS-St. Michael Hospital faced foreclosure when the hospitals' parent company,

Primary Health Systems, based in Wayne, Pa., filed for Chapter 11 bankruptcy in late 1998. In

March of 2000, PHS announced that it had struck a deal with the Cleveland Clinic, the city's other

major hospital system, to sell the two hospitals and the Integrated Medical Campus in suburban

Beachwood to the Cleveland Clinic for $62.7 million. As part of the deal, St. Michael, in

Cleveland's Slavic Village neighborhood, was going to be shut down. On March 29, 2000, U.S.

Bankruptcy Court Judge Mary F. Walrath ordered PHS to accept other bids for the two hospitals

and struck down a clause in the Cleveland Clinic agreement that made it difficult for other health

systems to bid on the hospitals. On May 2, PHS accepted University's bid to buy the hospitals for

$12 million.

114. The hospital has been struggling for years with a dwindling number of patients and shrinking

Medicare and Medicaid payments, which makes up the bulk of its revenue. It was alleged during

the bankruptcy proceedings that the Cleveland Clinic wanted to close the hospitals to lessen

the competition with other hospitals that the clinic owns. At that time, The Cleveland Clinic owned

about 62% of the hospital beds in the town.

115.    University Hospital Health System, subsidiary hospitals, clinics, and outpatient facilities

are in direct economic competition with the Cleveland Clinic Foundation Hospital, and their

wholly owned and operated Meridia Health System Hospitals, clinics and outpatient facilities.

University Hospitals Health System and the Cleveland Clinic Foundation Hospitals by and

through their wholly owned, and operated subsidiary facilities control a market share in the

Cleveland area equal to 90% of the health care market.

116.    University Hospital Health System also markets their own insurance plan to the general

public under the name of QualChoice. This insurance program includes a medicaid or state

funded component and offers insurance to the indigent.. This health insurance program offers to

subscribers a medical network of over 4,700 physicians practicing at 35 area hospitals, all of

which are in the University Hospital Health System. Although the program boasts of

"Affordable health insurance is possible due to a variety of medical plans for our members,

allowing for a large degree of flexibility in terms of medical practitioners and treatment

locations", all options available must include a medical provider/physician who has privileges at a

University Hospital Health System facility. UHHS-QualChoice works with Private Healthcare

Systems (PHCS) to serve members who reside or who travel outside the QualChoice service

area. Members who travel beyond the service area can use a PHCS facility for emergency

services. Secondly, PPO members who live outside of Ohio and have purchased the PHCS

network for all of their care can receive services from a PHCS network provider. PHCS serves

more than 6.5 million enrollees nationwide.

117.    Physician staff privileges at UHHS-St. Michael Hospital are renewable every two

(2) years as mandated by hospital bylaws, attached hereto and incorporated herein as though fully

rewritten. Prior to 2002, Plaintiff renewed his staff membership/privileges every two years with

Defendant hospital, UHHS-St. Michael Hospital. On November 4, 2002, Plaintiff was notified

that his hospital privileges were to expire on December 31, 2002 due solely to his failure to reapply

for privileges. The letter Plaintiff received stated essentially that if he failed to reapply for

privileges by November l8, 2002; he would be deemed to have voluntarily resigned his privileges

as a member of the surgical staff and medical staff as of the termination of the current term of his

privileges or December 31, 2002.

118.    The Plaintiff did not respond to this letter and request that he reapply, but instead allowed

the deadline to pass with full knowledge that all medical staff privileges at this University Hospital

facility would terminate on December 31, 2002.

119    In 1996, Plaintiff and Defendant Adamek were two of multiple co-defendants

in a medical malpractice case which involved the wrongful death of a patient. The patient was

over infused with fluids (over hydrated) during the surgical procedure by Defendant Adamek a

staff anesthesiologist which was the proximate result of brain death to the patient. There were no

complications of the actual surgical procedure itself only as a direct and proximate result of

negligence on the part of anesiologist Defendant Adamek.

120    December 10, 2002, Plaintiff performed a surgical procedure at UHHS-St. Michael's

Hospital. Defendant Adamek later alleged the bowel of the patient was perforated due

to the Plaintiff being unnecessarily rough with the patient during the opening incision. Surgical

assistant Lerner, also present at the time of the surgical procedure alleged yet another scenario for

the perforation of the bowel; that a needle used to inject local anesthesia into the incision

area nicked the bowel. Plaintiff does not deny that two small holes were indeed within the bowel

following the opening incision. He alleges instead that the two small holes were the direct and

proximate result of adhesions and "running the bowel" which requires squeezing the bowel to

ascertain whether there were any perforations. The result of the allegations made by Defendant

Adamek and furthered by Defendants Lopez, UHHS-St. Michael's Hospital, and University

Hospital was the summary suspension of Plaintiff which resulted in the premature termination of

his privileges at UHHS-St. Michael's Hospital. Courts have found that a license to practice

medicine is a property right, of which the physician may not be deprived without due process of

law. See, e.g., *Lowe v.*

*Scott*, 959 F.2d 323, 334 (1st Cir. 1992).  Yet, based upon the allegations of Plaintiff Adamek,

Plaintiff suffered a summary suspension of his staff privileges infringing upon his right to practice

medicine.

121.    The summary suspension of Plaintiff's privileges was made in direct contravention of the

UHHS-St. Michael's and University Hospital Bylaws which in relevant part reserve summary

suspension for purposes of protecting patient safety.  This summary suspension resulted in a

fictitious  report being made to the National Practitioner's Data Bank and to the medical licensing

authority for the state of Ohio. The adverse "professional review" actions reportable to the NPDB

include only those that are "based on a practitioner's professional competence or professional

conduct that adversely affects, or could adversely affect, the health or welfare of a patient." 45

C.F.R. §§60.3.  As enumerated previously, the incident which gave rise to the summary suspension

of Plaintiff took place on December 10, 2002.  Defendant Adamek, also a member of the surgical

team on December 10, 2002 alleges he witnessed Plaintiff commit a heinous act tantamount to a

criminal assault upon the patient.  In lieu of protecting this patient, he allowed Plaintiff to continue

with a surgical procedure instead of picking up a telephone and bringing to the hospital one of the

other five general surgeons on staff.  Plaintiff Adamek then departs the hospital leaving this same

patient under the absolute control of Plaintiff but only after signing blank patient care orders and

entrusting these orders to the absolute discretion of the nurses in post operative care area of

Defendant UHHS-St. Michael Hospital..  The following morning, Defendant Adamek brings

forth the allegations to Defendant Lopez alleging that Plaintiff recklessly caused physical harm to the patient during a surgical procedure. Defendant Adamek's complaint against Plaintiff further alleges Plaintiff breached the sterile field during the procedure on more than one occasion. Defendant Adamek alleges he personally witnessed these breaches of sterile field which could have potentially contaminated the surgical field potentially causing infection in the patient, yet again, as a member of the surgical team; Defendant Adamek did nothing to cure this situation or to protect the patient during the surgery.

122.    Defendants collectively permitted Plaintiff to continue the care of this patient post-operatively until December 18, 2002, 8 full days after the alleged incident of reckless abuse, negligence or misconduct. Then, and only then, did Defendants Lopez as Chief of Surgery for UHHS-St. Michael's Hospital advise Plaintiff of Defendant Adamek's complaint against him.

123.    Plaintiff immediately requested a copy of the complaint filed against him from Defendants Lopez and UHHS St. Michael Hospital. He was initially told he was not entitled to know the nature of the complaint against him by Defendant Lopez. During the initial telephone call in the late afternoon of December 18, 2002 from Defendant Lopez, Plaintiff requested a peer review by the Surgical Review Committee....or a review of the subject surgery by other surgeons. Defendant Lopez agreed to Plaintiff's request for such a review and scheduled the review for December 20, 2002 at 11:00 AM. One hour prior to the scheduled review, Plaintiff's office received a telephone call cancelling the peer review.

124.    Defendants Lopez and UHHS-St. Michael's Hospital were notified in early December 2002 of Plaintiff's scheduled out of the country trip during the Christmas holiday season. They

were again reminded of this scheduled trip on December 18, 2002 at the time the initial peer review was scheduled by Defendant Lopez. Plaintiff was departing on December 20, 2002 and not scheduled to return to the Cleveland area until January 2, 2003.

125    Following the cancellation of the December 20, 2002 hearing, Plaintiff departed as scheduled for his trip. Plaintiff's office was notified that the hearing had been rescheduled for December 28, 2002 with full knowledge that Plaintiff would not be able to attend. Further, Plaintiff's office was advised that he was not entitled to legal representation at this hearing in lieu of his personal appearance.

126    The Medical Executive Committee of Defendant UHHS-St Michael's Hospital did meet on December 30, 2002 and hearing one side only of the events of December 10, 2002 continued the summary suspension of Plaintiff pending further investigation.

127    Plaintiff's staff privileges, including surgical privileges expired on December 31, 2002 as he was advised by Defendants they would if he failed to reapply for privileges by November 18, 2002. This summary suspension was reported to the National Practitioner's Data Bank as a voluntary resignation while under investigation and suspension. The adverse "professional review" actions reportable to the NPDB include only those that are "based on a practitioner's professional competence or professional conduct that adversely affects, or could adversely affect, the health or welfare of a patient." 45 C.F.R. §§60.3. Plaintiff was suspended without due process protections. He did not receive notice of this hearing being rescheduled prior to his departure from the country and was not afforded an opportunity to be heard, as well as the opportunity to examine the evidence and cross-examine witnesses.

128.    The NPDB report was such as to publically demean both the professional conduct,

expertise, and standing of plaintiff for purposes of economic gain and restraint of fair trade. The

report maintained (1) Plaintiff resigned while under investigation and (2) the summary suspension

of Plaintiff's medical staff privileges. The voluntary resignation of Plaintiff predated the surgical

procedure from which the summary suspension arose by a period of not less than twenty-one (21)

calendar days and thirty (30) days exactly prior to notification of Plaintiff by Defendant Lopez

of the complaint being filed and any action taken.

129.    January 3, 2003, Plaintiff received a letter from Defendant Frank Karfes, Chief of the

UHHS-St Michael's Hospital Medical Staff notifying him of the Medical Executive Committee

decision to continue the summary suspension pending further investigation.

130.    On or about February 11, 2003, Plaintiff received a letter from Dr. Richard Ludgin, J.D.,

M.D. who is on the payroll for Defendant University Hospital Health System and who maintains

an office in the hospital facility of University Hospital Health System, which stated he was outside

consultant to afforded Plaintiff an opportunity to participate in an investigation. Inasmuch as

Plaintiff had yet to hear the testimony of Defendant Adamek, he was unaware of the full context of

what he was alleged to have done during this surgical procedure and also unaware of the manner in

which the allegations were being reported against him. As a direct and proximate result of the lack

of discovery prior to meeting with Dr. Richard Ludgin, Plaintiff was unable to meaningfully

address the allegations made against him.

131.    On or about April 18, 2003, Plaintiff received a letter from Richard Frenchie, Chief

Executive Officer of UHHS-St. Michael Hospital informing him of a decision made by the Medical

Executive Committee's decision to uphold his suspension of privileges and to refer the matter to

UHHS-St. Michael's Hospital.

132.    On or about May 6, 2003, Defendant received a letter from Richard Frenchie informing

Plaintiff of a decision made by Defendant UHHS St. Michael Hospital Board of Directors to

refer his case to the Joint Conference Committee.

133.    On or about July 16, 2003, Plaintiff received a letter authored by Richard Frenchie

informing him that the Defendant UHHS-St. Michael Hospital Board of Directors had

received and approved the UHHS-St. Michael Hospital Joint Conference Committee

recommendation that Plaintiff's suspension was proper, and placing limits on Plaintiff's

ability to reapply for privileges at Defendant UHHS-St. Michael Hospital.

134.    During late 2003, Defendant Kevin Cooper was advanced by Defendant University

Hospital Health System and UHHS-St. Michael's Hospital and represented to Plainitff

as an impartial hearing officer due to the fact that he was not in direct economic competition

with the Plaintiff as his practice was in the field of dermatology.  Plaintiff learned in late 2004

that Defendant Cooper had an undisclosed  vested financial interest in University Hospital

Health System.

ALLEGATIONS OF CORRUPT ACTIVITY AND CLAIMS:

135   Plaintiff incorporates by reference paragraphs one through 134 of this complaint:

136.   Plaintiff alleges on or about December 11, 2002,  Defendant Adamek who had

recently been elevated to the position of President Elect of the Medical Staff and it was in this

capacity that he misused his position of political authority to deprive Plaintiff, a board certified

surgeon of certain  fundamental rights necessary to continue to practice medicine in his chosen

field of expertise.

137.    Further, Plaintiff alleges Defendant Adamek conspired with Defendants Chief of Staff

Lopez, Richard Frenchie, UHHS-Medical Executive Committee Members, University Hospital

Health System, and J. Richard Ludgin to deprive him of certain fundamental rights necessary to

continue to practice medicine in his chosen field of expertise.

138.    The direct and proximate result of the concerted conduct by the defendants was such as to

be constitute unfair competition under Ohio State laws with the purpose of depriving Plaintiff of

fundamental rights of property ownership, interfere with his business relationship with others,

adversely affect his property rights with other competitors in the same geographical area in which

he practices and to adversely affect his ability to maintain a medical practice.

139.    The direct and proximate result of the conspiratorial conduct of the defendants collectively

to tamper with evidence and then use said tampered evidence in hearings against him violated his

substantive due process rights and furthered the conspiracy to deprive him of his rights of property

ownership.

140.    The proximate effect of defendants collective conspiracy and use of tampered evidence

was to obstruct justice in Plaintiff's case and to negatively impact upon his legal rights and

rights of property ownership.  Plaintiff alleges he was deprived of both procedural and

substantive due process rights as a direct and proximate result of the obstruction of justice and

tampering with evidence.

141.    The proximate result of the conspiratorial conduct of Defendants collectively was to

intentionally attempt to destroy the business of Plaintiff by destroying his reputation professionally.

The business of Plaintiff has economic value and Defendants collectively conspired to drive

Plaintiff out of business and to effectively limit his ability to practice with their competitor, the

Cleveland Clinic Foundation.

142.    The Defendants collectively conspired to defraud the Plaintiff during the hearing process

on the complaint filed against Plaintiff by Defendant Adamek by concealing, misleading, and

obstructing justice through the deliberate misrepresentation regarding the "impartiality" of hearing

officer Defendant Kevin D. Cooper with full knowledge that he had a direct financial interest in

Defendant University Hospital Health System as evidenced by the filing in Cuyahoga County

Common Pleas Court, Case No. CV-98-360288. In this case, Defendant Cooper indicates he

was appointed as Case Western Reserve University Medical School chairman in late 1994. Shortly

after this appointment, Defendants Cooper and University Hospital Health System sought to force

the transfer of shares of stock from Dr. William Lynch who was the sole shareholder of University

Dermatologists Inc. The Ohio Supreme Court determined that Defendants Cooper and University

Hospital Health System would be unjustly enriched by forcing the transfer of stock from the

original founder(s) of University Dermatologists Inc. to the Defendants. The Cuyahoga County

Common Pleas Court case was still winding it's way to conclusion at the very time that Defendants

University Hospital Health System and Cooper heard the Plaintiff's challenges to Defendants

allegations made against him.

143.    Plaintiff further alleges the peer review process conducted by Defendants collectively

was in the furtherance of a scheme to defraud Plaintiff of valuable practice rights. Plaintiff alleges

when he failed to reapply for privileges at Defendant UHHS-St. Michael Hospital in November of

2002, Defendants collectively conspired to end its relationship with him in a manner which would

effectively maintain the patients he had brought to the hospital for themselves and with intention of

removing him not only from the hospital, but to effectively deny him the ability to treat patients in

the area at another local  hospital at which he had full privileges, Deaconess Hospital, and to

interfere with his ability to treat patients in the Greater Cleveland area at Cleveland Clinic
Foundation Hospitals.

144.    Plaintiff alleges that the suspension of his clinical privileges at the 11th hour, after allowing
him to treat the patient for eight days following the alleged incident in the operating theater was
not in the furtherance of patient safety issues, but was instead a thinly cloaked veil of conspiracy
and that the suspension of his privileges resulted from unreasonable anti-competitive conduct.

145.    Plaintiff alleges the loss of privileges through summary suspension was initiated with malice
by Defendant Adamek for purposes of retaliation and was advanced by Defendants collective in the
furtherance of anti-competitive motives of Defendants.  Clear evidence suggests Defendant
Adamek, may himself have committed malpractice during this procedure and his conduct was an
attempt to camouflage his own culpability and negligence by filing of the complaint against
Plaintiff.  Defendants Lopez, University Hospital Health System, UHHS-St. Michael's Hospital
and Kevin D. Cooper all have a vested financial interest in any malpractice verdict rendered against
Defendant Adamek by virtue of their financial interest in University Hospital Health System.

146.    Plaintiff alleges Defendants conspired together to create a review procedure which
violated Plaintiff's due process right to a fair and impartial determination by the Board in
the furtherance of anti-competition motives and for purposes of committing a fraud upon
Plaintiff.

        Defendants created an enterprise as defined by Federal law and Ohio RICO 2923.32
(A)(1).and conspired with each other for the limited purpose of creating anti-competitive

conditions, tampering with evidence, obstructing justice, and defrauding Plaintiff of personal and tangible property rights in violation of Federal law and Ohio law..

148.    In the furtherance of anti-competitive conditions, Defendant University Hospital Health

System caused a memorandum to be sent by former Chief Executive Officer Farrah Walters

promoting an atmosphere of retaliation and fear of reprisal for physicians who had privileges

in Defendant University Hospital Health System and who also had privileges at competing

Cleveland Clinic Foundation Hospital facilities.

149.    Defendants Lopez, Adamek, UHHS St. Michael's Hospital and University Hospital Health

System conspired to eliminate direct economic threat posed by the Plaintiff, who previously

resigned from the Medical Staff of UHHS St. Michael's Hospital.  UHHS St.

Michael's Hospital had an average patient load of 50 to 60 patients throughout 2002.  There were

six (6) general surgeons (Drs. Torres, Enrique, Cutijan, Halabi, Plaintiff and Defendants Lopez

competing for these 50 to 60 patients, all of which would not have required surgery.  Drs. Halabi

and Plaintiff were the only two general surgeons of Middle Eastern descent.  The remaining four

(4) general surgeons were of Hispanic descent.

150.    Plaintiff was retaliated against by all defendants due to both his ethnicity, and to gain

economic advantage in violation of restraint of fair trade laws.

151.    Defendants conspired to cause the fraudulent reporting of a resignation under suspension

to the National Practitioners Data Bank with full awareness that this reporting would cause direct

economic loss to the Plaintiff by virtue of this reporting. Defendants made this fraudulent

misrepresentation with full awareness that the fraudulent reporting would have a negative financial

impact upon the Plaintiff personally and professionally and would serve to eliminate him as an

economic competitor not only in their immediate geographical area, but also would negatively

impact upon Plaintiff's ability to practice with their primary competitor the Cleveland Clinic

Foundation Hospital, subsidiaries and affiliates thereof. Defendants were further aware that the

reporting would be required to be noticed by Plaintiff on every insurance credentialing application,

hospital application for privileges, malpractice insurance application and to all state licensing

authorities, including but not limited to the state of Ohio.

152.    In l995, the only other general surgeon of Middle Eastern origin was also peer reviewed by

Defendants UHHS-St Michael's Hospital, University Hospital Health System and Defendant

Lopez. This peer review outcome resulted in a three (3) month suspension of all privileges at

Defendant UHHS-St. Michael's Hospital facility and was also reported to the National

Practitioners Data Bank. The issue involved in the peer review did not involve a quality of

care concern.

153. Through such mechanisms, Defendants conspired to discourage other competing

hospital and medical concerns from cooperating with Plaintiff and from providing referrals to

Plaintiff. Defendants conspired to deprive Plaintiff of access to other hospital facilities which

are considered necessary to practice Plaintiff's chose profession. Public demand for the surgical

services of Plaintiff were negatively affected by virtue of negative national reporting for purposes

of affecting market power.

154.    Plaintiff alleges Defendants collectively caused to be produced evidence of a pervasive,

effective conspiracy which by its very nature would have affected the demand curve for Plaintiff's

services and adversely affected income of the Plaintiff from surgical services.

155.    Defendants conspired collectively and collectively participated in or acquiesced to a scheme

to cause a negative reporting of information to all insurance carriers, Medicare, Medicaid, States in

which Plaintiff might seek licensure and to hospitals to which he might seek privileges.  The

information was skewed in such a fashion as to cast negatively upon the professional abilities

of Plaintiff and this act caused further injury to Plaintiff's reputation which constitutes an

anti-competitive act and consequence.

156.    Plaintiff alleges each Defendant through direct act or acquiescence actively participated

in causing injury to the reputation of Plaintiff with purposes of defrauding him of a property

right for financial gain.  It is clear, defendants conduct required acting in unison thereby "excluding

the possibility" of independent action by the alleged conspirators, and that all Defendants

conspired with a conscious commitment to a common scheme designed to achieve an unlawful

objective.   This is demonstrated by the concerted action of the various named defendants

as alleged herein.

157.    On March 27, 2004, Plaintiff caused a letter to be written to the law department of

University Hospital Health System thereby requesting St. Michael Hospital file a corrected report

indicating that the Plaintiff did not resign under suspension. Pursuant to the Letter dated November 4, 2002 from UHHS-St. Michael's Hospital stating in relevant part, "Since the current appointment period ends on December 31, 2002, we must receive your reappointment application no later than November 18, 2002. If we do not receive your reappointment application by this date, your appointment and privilege will terminate on December 31, 2002." Based upon the review and the interpretation of the bylaws of UHHS-St. Michael's Hospital by UHHS-St. Michael's Hospital as indicated above, there is no evidence that Plaintiff resigned his privileges to avoid or to prevent a professional review action; an action which would have been reportable.

158. The various acts and omissions of the named defendants clearly were done in a serial manner so as to directly and /or indirectly deprive the plaintiff of his serious fundament due process rights and to violate his professional standing. The acts were done in a pattern manner and tied together to generate a fraud against the plaintiff and further the alleged scheme as alleged to utilize records and charts and actual outcomes of patient care to be both skewered and at once, overlooked and ignored.

159. The Defendants used both U.S. Mail on numerous occasions during the calendar years of 2002, 2003 and 2004 as well as telephone service to transfer materials, including tampered documents in the furtherance of a scheme to defraud Plaintiff.

## DAMAGES

159.	The Plaintiff seeks Damages for the proximate and direct result of the reckless,

wanton and negligent and deliberately indifferent acts of the named Defendants as alleged

herein, where they individually and acting in concerted action, depriving the plaintiff

his fundamental due process rights and his due process property rights which are

implicated as alleged above.

160	The plaintiff's prayer for relief seeks damages under both 42 U.S.C. Section 1983,

as well as under the Civil RICO statutes as also alleged herein. {See 18 U.S.C. Section

1964(A) and (c) Civil RICO and for violations under the Sherman Anti Trust Act as alleged

and referenced in the plaintiff's RICO claim as well as the Health Care Quality Improvement

Act also referenced and plead herein.

## PLAINTIFF"S SECTION 1983 CLAIM 'S PRAYER FOR RELIEF:

161	AS to Counts One and Two, of the Plaintiff's Section 1983 claim, the plaintiff seeks

redress for the violation of his due process procedural rights for all reasonable compensatory

and monetary damages and losses which flow from the reckless, negligent and even deliberate

actions and failures of the Executive Committee of the University Hospital Health Systems

Saint Michael Hospital and its medical director, Dr. Lopez.   The plaintiff seeks relief

for the failure of the executive committee to afford him his adequate, fair and proper

due process which was to be afforded to him under both federal law [HCQIA] as well

'

as the 14th Amendment to the U.S. Constitution for individuals who are suffering

and/ or made, by proximately cause, to suffer a serious property right violation.

This prayer is made for damages from the named Defendants under this count,

to be Ordered to paid to the Plaintiff in an amount in excess of $25,000.00

162     As to Count Three, under the Plaintiff's Section 1983 claim, the Plaintiff seeks redress

and relief and monetary damages for his compensatory and economic losses as well as his

associated constitutional level violations and related losses, and damages, including

the emotional and mental upset as well as the defamatory nature of the violation in

particular in regards to the reporting issue contained herein.   The Plaintiff seeks

from Defendant Adamek, damages and relief in an amount in excess of $25,000.00

Twenty-Five Thousand Dollars due to Defendant Adamek's causing and acting in concert

to deprive the plaintiff of his fundamental due process rights to both his continued

employment and his professional reputation and standing in the medical community

across the country.

163     As to Count Four, The Plaintiff seeks under Section 1983, and the concerted action

standards, redress and relief, in an economic and monetary basis as well as for his

serious constitutional deprivations and associated losses and harm, including that

of his loss to his professional reputation and the serious consequences due to the

Defendant Kenneth Cooper's failure to disclose his close in business interest

as a University Hospital Health Systems hearing officer to the same entity to the

plaintiff prior to the peer review administrative hearing appeal being heard and determined

by Defendant Cooper.  AS such, the plaintiff suffered serious deprivation to his

14th Amendment rights and losses associated by this failure to disclose which is a
substantive and procedural due process violation for which Plaintiff seeks compensation in
an amount in excess of $25,000.00 against Defendant Kenneth Cooper.

164     The plaintiff further seeks damages and relief against the named Defendants in their
entirety both individually and as joint and several named defendants, for the continuing
violation of having his summary suspension continiously reported under a process
which violated his fundamental constitutional right to due process and fairness.
As a proximate cause of this failure by the named defendants, as alleged in this count,
the plaintiff seeks monetary and compensatory damages in an amount in excess of
$25,000.

165.    Due to the particular deceptive nature and the unique manner in which the original
complainant, Defendant Adamec chose to file this complaint and then participate
in its process to have the plaintiff suspended, even where the medical records indicate
that the plaintiff both encountered the medical complications in a direct and straightforward
manner and method and was allowed to perform good quality follow up care as well
as be able to not have access to the actual complaint's details, until well after the
summary suspension was clearly made and the data bank report made, the plaintiff
seeks punitive damages in excess of $3, 000,000.00 [Three Million Dollars] under
this portion of this constitutional claim.

166.    The plaintiff further seeks in this portion of his Demand, all reasonable attorneys
fees, costs and associated legal expenditures, be fully reimbursed and paid by the
named Defendants as allowed under 42 U.S.C. Section 1988.

PLAINTIFF"S RICO DAMAGES:

167.    The RICO Violations as alleged herein are to compensated in accordance with the applicable standards and statutory relief provided under Section

168.    Wherein the Plaintiff alleges and seeks all compensatory damages allowed under this statute for the losses, deprivations and violations as alleged herein, to his fundamental due process rights and business and professional property interest as a physician, the plaintiff seeks redress in excess of $25,000.00 together with costs of investigation, attorney fees and other such equitable relief as is established at trial.

   Prayer for Relief: Plaintiff's Sherman Act Violation Damages and Prayer for Relief as Plead Inside the RICO Claim:

169.    The Plaintiff was clearly further affected by this corrupt activity as alleged herein and prevented from further expanding and operating his business and practice in a manner which violated his rights and ability to practice his profession in a free manner. This constitutes an improper restraint of trade and was clearly at the hands of the defendants violative to be free from anti-trust activities.    Such violations under ..... section....[sherman act] as alleged by the Plaintiff herein seek all full and fair and adequate compensation to make him whole to redress the losses and damages associated with this violation.

170.    The plaintiff further seeks all applicable costs of bringing such an action including but not limited to reasonable attorneys fees, his legal fees for the original hearings as well as those associated with pursuing the redress of his constitutional rights under 42 U.S.C.

Section 1983 as well as the fees allowed under the Civil Rico Claim as stated herein.

All related costs, expenditures and relevant fees should be paid by the named Defendants

herein in full and fair and adequate amount to make the plaintiff whole.

171.     The plaintiff herein was, as a result of these named defendants made to suffer a serious

constitutional level violation of his Due Process Rights and his right to practice his

profession in a free manner.

172.     Such losses which are associated with this type of deprivations should be related to the

allegations in this complaint including those associated with the reporting being made to

the National Data Bank as alleged.

173.     These losses are not limited to pure out of pocket losses but represent the loss to the

plaintiff's reputation, his professional career curve and his standing in the medical

community as a long term board certified surgeon.  There is a clear professional

and reputational of a defamatory nature, which is alleged.  These flow from the various

serious deprivations contained in the failure to afford him the proper due process

as well as the organized pattern of activity that was undertaken in a unified effort

to seek to deprive the plaintiff of his business interest and fundamental due process

as alleged in complaint herein

174.     From the outset of this effort by the named Defendants to suspend the plaintiff,

the various named defendants acted in a manner so that they should be held liable in

their individual and official capacities, individually as well as joint and severally

as alleged herein.

175.     Where there is proof of an enterprise, the enterprise should be made to fully and fairly

and adequately compensate the plaintiff for all of his losses associated with this corrupt

176.    Due to this conduct, the plaintiff seek redress in the Amount of  for these [RICO/ Sherman

Act] violations and the losses associated with the named defendant Cooper and the University

Hospital Health System.   This type of deceptive conduct on the part of these Defendant

in failing to provide proper disclosure of the hearing officers business interests, should

be determined to be direct and intentional, and reckless, requiring the finding of a

particular mind set which demonstrates fraud and deception.

177.    As such, the plaintiff seeks damages of a punitive nature against Cooper personally

and officially under the applicable referenced statutes, in an amount which will fully

satisfy the act and the malicious nature of the same and prohibit this type of conduct

from being sanction and encouraged by such entities in the future.

Respectfully Submitted,

Richard A. Olivito O.S.C. # 0041242
7536 Market Street Suite 204
Boardman, Ohio 44512
330-965-6510